1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ISMAEL ROSALES ANICETO,                    No.  2:13-cv-1819 KJN P

12                    Petitioner,

13         v.                                     ORDER

14    FOULK, Warden,

15                    Respondent.

16

17    I.  Introduction

18           Petitioner is a state prisoner, proceeding through counsel, with a petition for writ of

19    habeas corpus pursuant to 28 U.S.C. § 2254.  Both parties consented to proceed before the

20    undersigned for all purposes.  See 28 U.S.C. § 636(c).  Petitioner challenges his 2011 conviction

21    of attempted murder and other charges.  He is serving a sentence of 40 years to life.  This action

22    is proceeding on the original petition filed November 12, 2013.  (ECF No. 15.)  Petitioner raises

23    two claims:  (1) the state court unreasonably applied clearly established federal law set forth in

24    Miranda v. Arizona, 384 U.S. 436, 444 (1966) (hereafter "Miranda"); and (2) the state court

25    unreasonably applied clearly established federal law set forth in In re Winship, 397 U.S. 358

26    (1970), and Jackson v. Virginia, 443 U.S. 307 (1979).  For the reasons set forth below, the

27    petition is denied.

28    ////

II. <u>Procedural History</u>

On March 4, 2011, a jury convicted petitioner of attempted murder, allowing another individual to shoot from a vehicle, active participation in a street gang, and assault with a firearm. (Respondent's Lodged Document ("LD") 4.)  The jury also found true the following allegations: the crimes (counts one, two and four) were committed for the benefit of a street gang;[1] a principal used a firearm (count one); and petitioner personally used a firearm (count four).

On August 30, 2011, petitioner was sentenced to forty-four years to life in state prison.

Petitioner filed a timely appeal, raising two claims.  (LD 1.)  On March 22, 2013, the California Court of Appeal for the Third Appellate District reversed petitioner's sentence for assault with a firearm, but otherwise affirmed the judgment.  (LD 4.)

Petitioner filed a petition for review in the California Supreme Court, but raised only the second claim challenging the insufficiency of the evidence.  (LD 5.)  The petition was denied on June 12, 2013.  (LD 6.)

Petitioner filed no collateral challenges in state court.

On August 12, 2013, petitioner was re-sentenced to forty years to life.  (LD 7.)

Petitioner filed the instant petition on November 12, 2013.  (ECF No. 15.)

---

[1] The street terrorism charge under California Penal Code § 186.22(a) states that:

> Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years.

<u>Id.</u>  The California Supreme Court clarified that "a violation of section 186.22(a) is established when a defendant actively participates in a criminal street gang with knowledge that the gang's members engage or have engaged in a pattern of criminal activity, and willfully promotes, furthers, or assists in *any* felonious criminal conduct by gang members."  <u>People v. Albillar</u>, 51 Cal. 4th 47, 54 (2010).  The gang-related sentencing enhancement under California Penal Code § 186.22(b)(1) has two elements:  (1) the defendant committed the underlying crime "for the benefit of, at the direction of, or in association with any criminal street gang;" and (2) the defendant committed the underlying crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members."  Cal. Penal Code § 186.22(b)(1); <u>Albillar</u>, 51 Cal. 4th at 59 (referring to the two separate prongs of the gang enhancement).

III.  Factual Background

In its unpublished opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> On the afternoon of March 18, 2009, Angelo Villanueva and his brother, both members of the Norteño criminal street gang, visited Villanueva's girlfriend at the Farmington Apartments, known Sureño turf, in Stockton. While Villanueva and his girlfriend were standing outside her apartment, [petitioner] and Samuel Paniagua, a member of the Sureño criminal street gang, approached them. [Petitioner] pulled out a gun, pointed it at Villanueva's chest, and asked, "[W]hy are you so scared?" Paniagua stood behind [petitioner]; he did not say anything. Villanueva had a run-in with Paniagua a few weeks earlier.
>
> Villanueva's girlfriend told Villanueva and his brother to "get in" her apartment, but instead, they got on their bicycles and left. [Petitioner] and Paniagua immediately got into a white van and followed them. [Petitioner] drove the van, and Paniagua was his passenger. Paniagua fired four or five shots at Villanueva and his brother out of the passenger side window of the van. Villanueva and his brother fell to the ground, and [petitioner] and Paniagua drove off. The van maintained its speed as the shots were being fired. Neither Villanueva nor his brother was shot.
>
> A detective in the Stockton Police Department's Gang Suppression Unit and an expert in Hispanic criminal street gangs in Stockton described the "violent" rivalry between the Norteño and Sureño criminal street gangs and Hispanic gang culture. Gang members thrive off the respect of other gang members and must retaliate when "disrespected" by a member of a rival gang to maintain their status within the gang. It is disrespectful for a rival gang member to wear his gang's color into a neighborhood dominated by a rival gang.
>
> Gang members display their gang affiliation through their clothing, tattoos, and verbiage.  Sureños are associated with the color blue, while Norteños are associated with the color red.  Sureños tend to dress conservatively in earth tones and have shaved heads or very short hair.  Norteños typically dress more flamboyantly and have longer hair. There are separate sub-sets within the Sureño criminal street gang, including the Vicky's Town (VST) and Playboy Sureños (PBS).
>
> Villanueva often wore his red rosary necklace on the outside of his clothes when he visited his girlfriend even though he was aware that Sureños lived in her apartment complex, and he was wearing it on the day in question.  The gang expert opined that Villanueva purposefully disrespected the Sureños living in the Farmington Apartments by wearing his red rosary, and that [petitioner] and Paniagua were compelled to respond. The expert described the

confrontation as a "hit up." According to the expert, a "hit up" occurs when a gang member confronts a rival gang member and typically involves brandishing a weapon and an exchange of words. Fellow gang members serve as witnesses and backup for one another. Villanueva's girlfriend also believed the confrontation was due to Villanueva's membership in the Norteño criminal street gang.

On June 29, 2010, [petitioner] was interviewed at the San Joaquin County Jail by Stockton Police Officer Jeffrey Tacazon, with the aid of a Spanish-speaking interpreter. Prior to interviewing [petitioner] about the crime, Tacazon read [petitioner] his Miranda rights, and [petitioner] indicated that he understood each of the rights and stated he was willing to speak to Tacazon.

On June 30, 2010, Deputy Kristy Mays, a correctional officer at the San Joaquin County Jail, conducted a booking interview of [petitioner] during which [petitioner] stated that he was a Sureño, and that he had enemies who were Norteños. On February 10, 2011, a correctional officer at the San Joaquin County Jail found a roster inside an inmate's cell that listed Sureño gang members who were housed in a certain section of the jail. The roster contained the names of gang members along with their cell numbers, booking numbers, nicknames, "hood" or gang sub-sets, and the charges pending against them. [Petitioner] was listed on the roster as having the moniker "Griyo" and belonging to "LVT." The gang expert was not familiar with "LVT" but acknowledged there could be active sub-sets of which he was not presently aware.

The gang expert opined that [petitioner] was an active member of the Sureño criminal street gang based on the following: he associated with Paniagua, a documented Sureño gang member; he was involved in a gang-related incident; and he admitted being an active member of the Sureño criminal street gang during his booking interview. The expert stated that [petitioner's] inclusion in the roster confirmed his opinion that [petitioner] was a Sureño gang member.

People v. Aniceto, No. C069293, 2013 WL 1174562, at *1-3 (Cal. Ct. App. Mar. 22, 2013)

(LD 4 at 3-5.)

IV. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

////

4

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Taylor, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If there is no reasoned decision, "and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the

contrary." Harrington, 131 S. Ct. at 784-85. That presumption may be overcome by a showing that "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

"When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013). "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of the claim. Johnson v. Williams, 133 S. Ct. at 1097.

## V. Petitioner's Claims

### A. Claim 1: Miranda

#### 1. Exhaustion

Respondent argues that petitioner's Miranda claim is not exhausted. Petitioner concedes that his appellate counsel failed to raise the Miranda claim in the California Supreme Court. Petitioner argues that his default should be excused due to the ineffective assistance of appellate counsel, who inexplicably failed to raise such claim in the petition for review in the California Supreme Court, after having raised it in the California Court of Appeal.

Under 28 U.S.C. § 2254(b)(1)(A), a habeas petitioner must first exhaust state court remedies on a claim before presenting that claim to the federal courts. "A petitioner has satisfied the exhaustion requirement if: (1) he has fairly presented his federal claim to the highest state court with jurisdiction to consider it . . . or (2) he demonstrates that no state remedy remains available." Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996) (citations and quotations omitted). "A petitioner fairly and fully presents a claim to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim." Insyxiengmay v. Morgan, 403 F.3d 657, 668 (9th Cir. 2005) (internal citations omitted). If the claim was not presented to the state's highest court on direct appeal, state collateral remedies must be exhausted. Reiger v. Christensen, 789 F. 2d 1425, 1427 (9th Cir. 1986).

Because petitioner failed to raise the <u>Miranda</u> claim in the California Supreme Court, his <u>Miranda</u> claim was not properly exhausted.

2. <u>Technical Exhaustion and Procedural Default</u>

However, petitioner contends that his first claim is technically exhausted because no available state relief remains for the unexhausted claim. Under California Rule of Court 8.500, formerly Rule 28, petitioner claims he cannot seek review of his <u>Miranda</u> claim in the California Supreme Court because a separate petition for review is now untimely. (ECF No. 27 at 10.) Moreover, petitioner argues that he may not raise his <u>Miranda</u> claim by way of a habeas petition in the California Supreme Court because habeas relief is not available for claims that should have been brought by direct appeal. (ECF No. 27 at 11, citing <u>In re Waltreus</u>, 62 Cal. 2d 218, 225 (1965) (a habeas corpus petition in the California courts "ordinarily cannot serve as a second appeal")).

Respondent contends that the court may dismiss the petition as a mixed petition containing both exhausted and unexhausted claims, or the court may deny, but may not grant, petitioner's unexhausted claim, citing 28 U.S.C. § 2254(b)(2), <u>Cassett v. Stewart</u>, 406 F.3d 614, 623-24 (9th Cir. 2005). (ECF No. 23 at 17.)

State remedies are technically exhausted, but not properly exhausted, if a petitioner failed to pursue a federal claim in state court and there are no remedies available now. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 848 (1999). Under these circumstances, the claims are considered procedurally defaulted. <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991); <u>see also</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 92-93 (2006).

When a state prisoner defaults on his federal claims in state court, pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate "(1) good cause for his failure to exhaust the claim; and (2) prejudice from the purported constitutional violation; or (3) demonstrates that not hearing the claim would result in a fundamental miscarriage of justice.'" <u>Cooper v. Neven</u>, 641 F.3d 322, 327 (9th Cir. 2011) (quoting <u>Coleman</u>, 501 U.S. at 750) (further citation omitted). To satisfy the "cause" prong of the cause and prejudice standard, petitioner must show that some objective

factor external to the defense prevented him from complying with the state's procedural rule.  Id. at 753 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)); Cooper, 641 F.3d at 327 (i.e., ineffective assistance of counsel).  To show "prejudice," the petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  United States v. Frady, 456 U.S. 152, 170 (1982); Cooper, 641 F.3d at 327.  "Constitutionally ineffective assistance of counsel plus actual prejudice will satisfy this test and allow habeas review of a procedurally defaulted claim."  Walker v. Martel, 709 F.3d 925, 938 (9th Cir. 2013) (citing McCleskey v. Zant, 499 U.S. 467, 494 (1991)).  Only in an "extraordinary case" may the habeas court grant the writ without a showing of cause or prejudice to correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the conviction of a defendant who is actually innocent.  Murray, 477 U.S. at 495-96.

For the following reasons, the undersigned finds that petitioner's claims are technically exhausted.

In 2012, the California Supreme Court summarized the applicable California law regarding timely habeas petitions as follows:

> Our rules establish a three-level analysis for assessing whether claims in a petition for a writ of habeas corpus have been timely filed. First, a claim must be presented without substantial delay. Second, if a petitioner raises a claim after a substantial delay, we will nevertheless consider it on its merits if the petitioner can demonstrate good cause for the delay. Third, we will consider the merits of a claim presented after a substantial delay without good cause if it falls under one of four narrow exceptions: "(i) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (ii) that the petitioner is actually innocent of the crime or crimes of which he or she was convicted; (iii) that the death penalty was imposed by a sentencing authority that had such a grossly misleading profile of the petitioner before it that, absent the trial error or omission, no reasonable judge or jury would have imposed a sentence of death; or (iv) that the petitioner was convicted or sentenced under an invalid statute." (In re Robbins, supra, 18 Cal. 4th at pp. 780-781.) The petitioner bears the burden to plead and then prove all of the relevant allegations. (Ibid.)

> The United States Supreme Court recently, and accurately, described the law applicable to habeas corpus petitions in California: "While most States set determinate time limits for

8

collateral relief applications, in California, neither statute nor rule of court does so. Instead, California courts 'appl[y] a general "reasonableness" standard' to judge whether a habeas petition is timely filed. Carey v. Saffold, 536 U.S. 214, 222 (2002). The basic instruction provided by the California Supreme Court is simply that 'a [habeas] petition should be filed as promptly as the circumstances allow. . . .'" (Walker v. Martin, supra, 562 U.S. at p. _____, 131 S. Ct. at p. 1125.) "A prisoner must seek habeas relief without 'substantial delay,' [citations], as 'measured from the time the petitioner or counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim,' [citation]." (Ibid.; see also In re Robbins, supra, 18 Cal. 4th at p. 780) ["Substantial delay is measured from the time the petitioner or his or her counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim."].)

In re Reno, 55 Cal. 4th 428, 460-61 (2012).

In the instant case, the California Supreme Court denied the petition for review on June 12, 2013, and petitioner filed no collateral challenges in state court. Because almost four years have passed since the California Supreme Court issued its decision, it is likely that a state petition raising the unexhausted claim would be found untimely. See Velasquez v. Kirkland, 639 F.3d 964, 967-68 (9th Cir. 2011) (the thirty-day to sixty-day period is presumptively reasonable.) It is also likely that petitioner's unexhausted Miranda claim would be denied by the California Supreme Court on the ground that it should have been raised on appeal. Moreover, petitioner does not raise an actual innocence claim, so is not entitled to an actual innocence exception. Thus, requiring petitioner to return to state court to attempt to exhaust the Miranda claim would frustrate the pursuit of justice. The court finds that petitioner's Miranda claim is technically exhausted and subject to procedural default.

However, a reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim. Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997). Where deciding the merits of a claim proves to be less complicated and less time-consuming than adjudicating the issue of procedural default, a court may exercise discretion in its management of the case to reject the claim on the merits and forgo an analysis of procedural default. See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make

9

sense in some instances to proceed to the merits if the result will be the same"); Busby v. Dretke, 359 F.3d 708, 720 (5th Cir. 2004) (noting that although the question of procedural default should ordinarily be considered first, a reviewing court need not do so invariably, especially when the issue turns on difficult questions of state law). Under the circumstances presented here, the undersigned finds that petitioner's Miranda claim can be more easily resolved on the merits. Accordingly, the undersigned will assume, without deciding, that such claim is not defaulted and address the Miranda claim on the merits.

### 3. Merits

Petitioner argues that the state court's application of Miranda was erroneous because the court failed to properly analyze the totality of the circumstances prior to concluding that Officer Tacazon's admonition the prior day should be considered contemporaneous. (ECF No. 15 at 24.) Petitioner argues that petitioner was not represented by counsel, the interrogations were conducted a day apart, and the interrogators were distinct individuals from different departments, with one interrogation in English and one in Spanish. Because these interrogations were distinct and separate, and not part of a continuous investigative action, petitioner argues that each required Miranda warnings. Further, petitioner contends that if the state court had properly conducted the Miranda analysis, the court would have reversed the conviction because Mays' interviewer knowingly asked questions likely to elicit an incriminating response, not focused on petitioner's identity, and constituting an interrogation that required a separate Miranda admonition, citing United States v. Gonzales-Sandoval, 894 F. 2d 1043, 1046-47 (1990). (ECF No. 15 at 28-31.) Because petitioner was not identified as a gang member in the police database and did not have a prior arrest record, petitioner contends that the government relied heavily on petitioner's admissions to Mays to identify him as a gang member at trial. (ECF No. 15 at 31, citing RT 458.) Because this was the prosecution's primary evidence of petitioner's alleged gang affiliation, petitioner argues that the admission of his statements to Mays cannot be considered harmless. Petitioner contends that without his admission of gang membership, the prosecution would have no corroborating evidence of gang affiliation to support the substantive charge and enhancements. (ECF No. 15 at 33.)

Respondent counters that the state court reviewed the totality of circumstances surrounding petitioner's booking interview and reasonably determined that his circumstances had not seriously changed from the day before when he was advised of his <u>Miranda</u> rights. (ECF No. 23 at 22.) Respondent argues that the Ninth Circuit has found that far longer intervals between advisements and subsequent interviews do not render a defendant's confession involuntary. (ECF No. 23 at 22.) In any event, respondent contends that there was strong independent evidence supporting the gang-related charge and enhancement so that admission of the challenged statement did not have a substantial and injurious effect on the jury's verdict. Specifically, respondent points to the following evidence: petitioner associated with Paniagua, a member of the Sureños; petitioner and Paniagua confronted two Norteño gang members in an apartment complex, known to be Sureño turf; one of the Norteños wore a red rosary, which the gang expert opined was a purposeful sign of disrespect for the Sureños who lived there, requiring retaliation by opposing gang members; the gang expert also opined that the initial confrontation was a "hit-up" between the rival gang members; shortly after the initial confrontation, Paniagua and petitioner followed the retreating Norteño gang members, and Paniagua shot at them; and petitioner's name was found on a roster containing Sureño gang members. (ECF No. 23 at 22.)

In reply, petitioner argues that respondent failed to analyze the totality of the circumstances, instead following the state court's analysis, and relying on the time interval alone. Petitioner again contends that the two interrogations were separated by significant time, personnel, language, and conducted without any legal representation, suggesting that petitioner was entirely unaware of his <u>Miranda</u> rights at the second interrogation by Mays. Moreover, petitioner disputes respondent's claim that there was "strong, independent evidence" supporting the gang charge and enhancement. Petitioner contends that the prosecution's primary evidence of gang affiliation came from gang expert, Detective Mercado, who opined that petitioner was a gang member based on petitioner's brandishing the night of the incident, his affiliation with Paniagua, and his statement to Officer Mays that he was a Sureño. (ECF No. 27 at 14, citing RT 458, 459.) Petitioner argues that unlike the other suspects involved here, there was no independent information in the police files or the gang database that implicated petitioner as an

active gang member, and he was notably absent from the scenes of the predicate gang offenses Detective Mercado detailed at trial. (ECF No. 27 at 14-15.) Petitioner contends that such circumstantial evidence did not constitute "strong" or "persuasive evidence" of gang membership such that the erroneous admission of petitioner's statements to Mays constituted harmless error.

### a. State Court Opinion

The last reasoned rejection of petitioner's first claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. (LD 4.) The state court addressed this claim as follows:

> The Trial Court Did Not Err in Admitting Evidence Defendant Claimed a Gang During His Booking Interview
>
> Defendant first contends that the "[i]ntroduction of evidence that [he] claimed a gang during the booking interview violated [his] constitutional rights against self-incrimination and to due process of law."
>
> Prior to trial, defendant moved to exclude statements he made during a booking (or jail classification) interview, arguing his statements were taken in violation of <u>Miranda</u>. The trial court held an evidentiary hearing (Evid. Code, § 402) at which Deputy Mays, the correctional officer who conducted the interview, testified. Mays interviewed defendant on June 30, 2010. At the time, she was working "classification" at the jail. Each inmate who is going to remain in custody at the jail goes through the same booking interview process, during which the inmate is asked, among other things, "if they have any affiliation with gangs in order to determine if they have enemies in jail. . . ." The sole purpose of the gang-related questions is to determine appropriate housing for each inmate. During the booking interview at issue here, Mays asked defendant if he claimed any gang affiliation, and he responded, "yes." She then asked him if he claimed Sureño, and he said, "yes." To be sure, she asked him if he had enemies that were Norteño gang members, and he said, "yes." The interview was conducted in a holding cell in the San Joaquin County Jail's main lobby. Mays explained that there is a "general lobby where the masses sit and then special holding cells for others that need protection." Knowing an inmate's gang affiliation is especially important in the case of Sureño gang members because the San Joaquin County Jail is a "highly populated Norteño jail and it would not be in a Sureño's best interest to put him in a lobby filled with a lot of Norteños that may be in [the jail's] custody off the street."
>
> The trial court ruled the evidence was admissible, finding that the gang-related questions were not designed to elicit an incriminating response but were asked for the purpose of ensuring the safety of defendant and others in the jail.

Miranda admonitions must be given and an individual in custody must knowingly and intelligently waive those rights before being subjected to either express questioning or its "functional equivalent." (Rhode Island v. Innis (1980) 446 U.S. 291, 300-301 [64 L.Ed.2d 297, 307-308]; People v. Ray (1996) 13 Cal. 4th 313, 336.) Unwarned statements made during a custodial interrogation, even if otherwise voluntary within the meaning of the federal Fifth Amendment, generally must be excluded from evidence at trial. (Oregon v. Elstad (1985) 470 U.S. 298, 307 [84 L.Ed.2d 222, 231]; People v. Bradford (1997) 14 Cal. 4th 1005, 1033.)

Not all conversation between a police officer and a suspect constitutes interrogation under Miranda. (People v. Ray, supra, 13 Cal. 4th at p. 338.) Ordinarily, the routine gathering of background information on a suspect such as in a booking process will not constitute an interrogation. (See People v. Gomez (2011) 192 Cal. App. 4th 609, 630.) On the other hand, comments that go beyond preliminary identification inquiries and are designed to elicit an incriminating response are within the scope of Miranda. (See People v. Gomez, supra, at pp. 629-630.)

Whether the questions concerning defendant's gang affiliation were designed to elicit an incriminating response presents an interesting issue where, as here, Deputy Mays was aware of the charges pending against defendant, gang detectives have access to gang classification information, and such information is routinely included in reports prepared by gang detectives; however, we need not consider that issue here because even assuming the booking interview constituted an interrogation, defendant was advised of and knowingly waived his Miranda rights prior thereto.

As previously mentioned, on June 29, 2010, defendant was interviewed at the San Joaquin County Jail by Officer Tacazon. Prior to interviewing defendant about the crime, Tacazon read defendant his Miranda rights, and defendant indicated that he understood each of the rights, and that he was willing to speak to Tacazon. While there is no indication in the record that defendant was readvised of his Miranda rights prior to the booking interview, "'readvisement is unnecessary where the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver. [Citations.] The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights. [Citations.]'" (People v. Lewis (2001) 26 Cal. 4th 334, 386, quoting People v. Mickle (1991) 54 Cal. 3d 140, 170.) In People v. Mickle, supra, 54 Cal. 3d at page 171, our Supreme Court held that readvisement was not required after a lapse of 36 hours between interrogations. The court considered the totality of the circumstances, including the fact that the defendant was still in custody, was interviewed by the same interrogators, was reminded of his prior waiver, and was familiar with the justice system. (Ibid.)

In this case, the booking interview occurred the day after defendant was interviewed by Officer Tacazon. Thus, the <u>Miranda</u> warnings would have been fresh in defendant's mind. Defendant remained in custody at the San Joaquin County Jail during the interim. While the identity of the interviewer changed, both interviews were conducted at the same location -- the San Joaquin County Jail. Moreover, the record indicates defendant subjectively understood his right to remain silent. He was fully admonished of his rights the previous day and had voluntarily waived them, and there is no indication in the record suggesting that defendant was mentally impaired or otherwise incapable of remembering the prior advisement.

Defendant correctly observes that in <u>People v. Mickle</u>, <u>supra</u>, 54 Cal. 3d at page 171, the court noted, as factors in the analysis, the defendant was interviewed by the same investigators and was readvised of his <u>Miranda</u> rights, factors not shown to exist here. Considering "the totality of the circumstances" (<u>People v. Mickle</u>, supra, at p. 170), however, we do not agree the absence of these factors alone undermine our finding that defendant participated in the booking interview voluntarily and with knowledge of his rights. That not all of the factors listed in <u>Mickle</u> were satisfied does not show that a second advisement was necessary. The factors are not a list of requirements that must all be satisfied. (See <u>People v. Williams</u> (1997) 16 Cal. 4th 635, 661 ["no single factor is dispositive in determining voluntariness, but rather courts consider the totality of circumstances"].) Rather, the point of the factors is to assist in the determination of whether the advisement is "'reasonably contemporaneous'" with the second interrogation and whether, at the time of the second interrogation, the defendant is still in the condition of having subjectively understood and waived his rights in light of the totality of the circumstances. (<u>People v. Mickle</u>, <u>supra</u>, 54 Cal. 3d at pp. 170-171.)

To the extent defendant argues that his statement was involuntary because if he had chosen to remain silent he would have been housed with rival gang members who could harm him, this argument also lacks merit.

"'"Once a suspect has been properly advised of his [or her] rights, he [or she] may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. . . . [I]n carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. . . ." [Citation.]' [Citation.]" (<u>People v. Carrington</u> (2009) 47 Cal. 4th 145, 170.)

Here, there is no indication in the record that Deputy Mays threatened defendant or made any false promises of leniency. That exercising one's right to remain silent will have adverse consequences for the defendant does not make the defendant's statements involuntary. "The compulsion [to speak] must be attributable to the state." (<u>People v. Mickey</u> (1991) 54 Cal.3d 612, 650.) Here, any compulsion was attributable to defendant and not

14

the state. In any event, defendant was not compelled to admit he was in a gang. He could have responded, as he does in his reply brief, that he "wanted to be housed with Sureños, because he hung out with Sureños at his apartment complex, and if Norteños learned of his friendship with Sureños he would be in danger."

The trial court properly admitted defendant's statements that he was a Sureño with Norteño enemies.

People v. Aniceto, No. C069293, 2013 WL 1174562, at *5-6 (Cal. Ct. App. Mar. 22, 2013)

(LD 4 at 5-9.)

### b. Standards

In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her. Id. at 473-74. These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations." DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009). Once Miranda warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease." Smith v. Illinois, 469 U.S. 91, 98 (1984). See also Miranda, 384 U.S. at 473-74; Michigan v. Mosley, 423 U.S. 96, 100 (1975).

A defendant may waive his Miranda rights, provided the waiver is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). However, an express waiver of Miranda rights is not necessary. Berghuis v. Thompkins, 560 U.S. 370, 384 (2010); United States v. Younger, 398 F.3d 1179, 1185 (9th Cir. 2005) ("In soliciting a waiver of Miranda rights, police officers need not use a waiver form nor ask explicitly whether a defendant intends to waive his or her rights"). A valid waiver of rights may be implied under the circumstances presented in the particular case. Specifically, "a suspect may impliedly

15

waive the rights by answering an officer's questions after receiving <u>Miranda</u> warnings." <u>United States v. Rodriguez</u>, 518 F.3d 1072, 1080 (9th Cir. 2008).

However,

> [t]he Supreme Court has eschewed per se rules mandating that a suspect be re-advised of his rights in certain fixed situations in favor of a more flexible approach focusing on the totality of the circumstances.  <u>See</u> <u>Wyrick v. Fields</u>, 459 U.S. 42, 48-49, 103 S. Ct. 394, 74 L. Ed. 2d 214 (1982) (per curiam) (rejecting per se rule requiring police to re-advise suspect of his rights before questioning him about results of polygraph examination). Consistent with Wyrick's admonition against "unjustifiable restriction[s] on reasonable police questioning," <u>id.</u> at 49, 103 S. Ct. 394, "[t]he courts have generally rejected a per se rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." <u>United States v. Andaverde</u>, 64 F.3d 1305, 1312 (9th Cir. 1995).  Indeed, in a decision upholding the admissibility of statements made nearly fifteen hours after <u>Miranda</u> warnings were administered, <u>see</u> <u>Guam v. Dela Pena</u>, 72 F.3d 767, 770 (9th Cir. 1995), we cited with approval earlier decisions involving intervals of two days, <u>id.</u>, citing <u>Puplampu v. United States</u>, 422 F.2d 870 (9th Cir. 1970) (per curiam), and three days, <u>id.</u>, citing <u>Maguire v. United States</u>, 396 F.2d 327, 331 (9th Cir. 1968).

<u>United States v. Rodriguez-Preciado</u>, 399 F.3d 1118, 1128-29 (9th Cir.), <u>amended</u>, 416 F.3d 939 (9th Cir. 2005).  Similarly, another circuit has ruled that a <u>Miranda</u> warning does not lose its efficacy if a defendant is warned by one officer and then interrogated by another.  <u>Jarrell v. Balkcom</u>, 735 F.2d 1242, 1254 (11th Cir. 1984), <u>cert. denied</u>, 471 U.S. 1103 (1985) (defendant confessed three hours after receiving his <u>Miranda</u> warnings).  To determine whether the subsequent interrogation is reasonably contemporaneous with the prior <u>Miranda</u> waiver, "courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights." <u>Mickle v. Ayers</u>, 2007 WL 1456044 (N.D. Cal. May 17, 2007), citing <u>see</u> <u>Martin v. Wainwright</u>, 770 F.2d 918, 930-31 (11th Cir. 1985).

"[T]he term 'interrogation' under <u>Miranda</u> refers . . . to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>,

446 U.S. 291, 301 (1980). The "booking questions exception" exempts "from <u>Miranda's</u> coverage questions to secure the biographical data necessary to complete booking or pretrial services." <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 601 (1990) (plurality opinion) (quotation marks omitted) (concluding that the answers to questions regarding the defendant's name, address, height, weight, eye color, date of birth, and current age were admissible in the absence of <u>Miranda</u> warnings).

Recently, in <u>United States v. Williams</u>, 842 F.3d 1143 (9th Cir. 2016), the Ninth Circuit determined that questions regarding a defendant's gang affiliation constituted interrogation that did not fall within the booking exception to <u>Miranda</u> requirements. <u>United States v. Williams</u>, 842 F.3d at 1147-48. "[A] defendant charged with a violent crime in California who is a gang member is subject to far greater jeopardy than those who are not gang members." <u>Id.</u> at 1149. "[G]ang membership exposes a defendant to 'a comprehensive scheme of penal statutes aimed at eradicating criminal activity by street gangs.'" <u>Id.</u> at 1147, quoting <u>People v. Elizalde</u>, 61 Cal. 4th 523, 538, 189 Cal. Rptr. 3d 518 (2015).[2] The Ninth Circuit held that "when a defendant

---

[2] At the time petitioner was questioned in 2010, there was authority finding that FBI agents' question regarding the prisoner's gang moniker was a routine booking question because "agents routinely obtain gang moniker and gang affiliation information . . . in order to ensure prisoner safety." <u>United States v. Washington</u>, 462 F.3d 1124, 1132-33 (9th Cir. 2006) (because the gang moniker question was a "routine gathering of background information," it was not an interrogation and did not implicate <u>Miranda</u>). <u>See also</u> <u>Batchelor v. Long</u>, 2012 WL 6965072, at *4-6 (C.D. Cal. Dec. 4, 2012), <u>report and recommendation adopted,</u> 2013 WL 375206 (C.D. Cal. Jan. 29, 2013) (no habeas relief warranted for defendant who was not <u>Mirandized</u> prior to booking admission he was gang member because state court "correctly concluded that there is no constitutional prohibition to the police asking a detainee about gang affiliation before advising him of <u>Miranda</u> rights.) <u>See also</u> <u>United States v. Edwards</u>, 563 F.Supp .2d 977, 999 & n.1 (D. Minn. 2008), <u>aff'd sub nom.</u> <u>United States v. Bowie</u>, 618 F.3d 802 (8th Cir. 2010), <u>cert. denied</u>, 131 S. Ct. 954 (2011) & 131 S. Ct. 1586 (2011) (holding that routine questions regarding gang affiliation, which were "prompted by a concern for the facility and inmate safety," did not implicate <u>Miranda</u>); <u>People v. Gomez</u>, 192 Cal. App. 4th 609, 634, 121 Cal. Rptr. 3d 475 (2011) ("The classification of inmates by gang affiliation for jail security purposes can be a legitimate administrative concern."). Subsequently, in <u>Elizalde</u>, the California Supreme Court disapproved <u>Gomez</u>, and found that a classification interview that took place while the defendant was booked into jail did constitute a "custodial interrogation" for purposes of <u>Miranda</u>, and held that the defendant's un-<u>Mirandized</u> responses to questions about his gang affiliation were not within the public safety exception. <u>People v. Elizalde</u>, 61 Cal. 4th 523 (June 25, 2015) (but holding that error in admitting defendant's un-<u>Mirandized</u> statements was harmless beyond a reasonable doubt). Then, in 2016, the Ninth Circuit found such gang-related questioning during booking to

charged with murder invokes his <u>Miranda</u> rights, the government may not in its case-in-chief admit evidence of the prisoner's unadmonished responses to questions about his gang affiliation." <u>United States v. Williams</u>, 842 F.3d at 1150.

The erroneous admission of statements taken in violation of a defendant's Fifth Amendment rights is subject to harmless error analysis. <u>Neder v. United States</u>, 527 U.S. 1, 18 (1999); <u>Ghent v. Woodford</u>, 279 F.3d 1121, 1126 (9th Cir. 2002). In reviewing the prejudicial effect of the erroneous admission of testimony, the question is whether the erroneously admitted evidence had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993). <u>See also Bains v. Cambra</u>, 204 F.3d 964, 977 (9th Cir. 2000); <u>Garcia v. Long</u>, 808 F.3d 771, 781 (9th Cir. 2015).

c. <u>Discussion</u>

The record reflects that petitioner was advised of his <u>Miranda</u> rights on June 29, 2010, when he was interviewed by Officer Tacazon through a Spanish interpreter at the San Joaquin County Jail. Petitioner did not assert his right to remain silent or to have counsel present during the interview on June 29; rather, he waived his rights and agreed to speak to the officer. During this interview, petitioner did not admit to being a gang member, but told Tacazon that petitioner hung out with the Sureños at the building where he lived. (RT 343.)

After waiving his rights and being interviewed by Tacazon, petitioner was interviewed the next day by Deputy Mays, a correctional officer in the classification unit at the jail. (RT 307-08; 313.) Mays used a "risk assessment form" for determining inmate housing, and the form was used to question all inmates who would remain in custody. (RT 308-09.) During this process, Mays asked petitioner if he claimed any gang affiliation, and he responded yes, Sureño. (RT 311.) Mays also asked petitioner if he had enemies that were Norteño inmates, and he said yes. (RT 311, 313.) Mays testified that petitioner claimed "active Sureño." (RT 312.) Mays wrote down that petitioner claimed to be an active Sureño and had enemies with Norteños. (RT 312.)

_____

be custodial interrogation requiring <u>Miranda</u> warnings. <u>United States v. Williams</u>, 842 F.3d at 1143. Thus, the state court did not have benefit of <u>Elizalde</u> or <u>United States v. Williams</u> at the time petitioner's case was decided.

18

1    Mays testified that she believed she interviewed petitioner in English, but was not sure as she

2    knows some Spanish.  (RT 311.)  If Mays had communicated in another language or experienced

3    a language difficulty or barrier, Mays would have documented it in her report.  (RT 311-12; 314.)

4    Mays stated that petitioner was held in a separate holding cell in the lobby based on questions

5    asked at pre-screening, which would have indicated to Mays that there was a reason for his

6    placement in the special holding cell.  (RT 310-11.)  On cross-examination, Mays confirmed that

7    on her questionnaire, the only gang-related question is "Are you in a gang?"  (RT 314.)

8         Mays confirmed that she was aware of the criminal charges petitioner faced at the time

9    she interviewed him, including that petitioner was arrested for attempted murder, and for

10   violation of Penal Code Section 186.22(a), being a gang member.  (RT 82.)  Petitioner had no

11   prior criminal record of gang involvement, and his prior criminal record involved some DUI's,

12   but petitioner had not served any prison time.  (RT 824.)

13        In the instant petition, petitioner does not dispute the validity of his initial Miranda

14   waiver; rather, petitioner argues that Mays should have Mirandized petitioner again before asking

15   petitioner the gang-related questions during the booking interview because such questions would

16   elicit incriminating information given the criminal charges known to Mays.  Petitioner contends

17   that the state appellate court erroneously applied Miranda and failed to conduct a proper totality

18   of the circumstances analysis prior to concluding the Miranda admonition by Tacazon was

19   reasonably contemporaneous.

20        However, the record reflects that the state court carefully reviewed the circumstances

21   surrounding petitioner's interview by Mays.  (LD 4.)  The state court noted that Mays was aware

22   of the charges facing petitioner, and that the gang detectives have access to the gang classification

23   information, which is routinely included in reports prepared by the gang detectives, but found that

24   petitioner had knowingly waived his Miranda rights.  The state court found that the booking

25   interview was the day after the Tacazon interview, and that the Miranda warning would still be

26   fresh in petitioner's mind.  Although the interviewer changed, petitioner was still in custody at the

27   county jail.  Finally, the state court found that petitioner subjectively understood the Miranda

28   warning given in Spanish and had voluntarily waived his rights, and that there was no indication

19

that petitioner was impaired or incapable of remembering the warning he received the day before. Moreover, the state court explained that not all of the factors had to be met in order to find the Miranda waiver was reasonably contemporaneous.[3]

Here, petitioner was read his Miranda rights which were translated into petitioner's native language, for the purpose of accusatory questioning. Petitioner did not invoke his Miranda rights, and answered Tacazon's questions. That the questioning continued the next day by the correctional officer in classification did not render the Miranda warning stale or ineffective. For example, in Rodriguez-Preciado, the defendant was read his Miranda rights in his motel room, but the Ninth Circuit held that a rewarning was not required when questioning continued the next day at the jail despite a break in questioning and a change in interrogator. Rodriguez-Preciado, 399 F.3d at 1129; Dela Pena, 72 F.3d at 769-70 (not entitled to another warning just because there was a break in questioning). "'There is no requirement that an accused be continually reminded of his rights once he has intelligently waived them.'" McClain v. Hill, 52 F. Supp. 2d 1133, 1141 (C.D. Cal. 1999), (quoting Andaverde, 64 F.3d at 1312). "Thus, the mere passage of two days between the time petitioner was informed of and waived his Miranda rights and the time he made his incriminating statement does not violate the Fifth Amendment." McClain, 52 F. Supp. 2d at 1141.

Here, if Tacazon's partner had returned the following day and asked petitioner if he were a member of a gang, Tacazon's partner would not have been required to first re-advise petitioner of his Miranda rights. Of course, the outcome would be different if petitioner had not been read his Miranda rights at all, as was the case in Elizalde, or United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir. 1990), where Gonzalez-Sandoval was not given any Miranda warning while he was detained at the police station. Similarly, the outcome would be different if petitioner had invoked his right to counsel as the defendant did in United States v. Williams. But here, petitioner waived his Miranda rights and agreed to speak the day before the Mays interview.

---

[3] It appears that the only factor the state court did not address was petitioner's "sophistication or past experience with law enforcement." However, under the circumstances, the state court's failure to address this factor does not outweigh the remaining factors that were considered.

Given the gang-related charges petitioner faced, and that Mays was aware of such charges, Mays' questions concerning gang affiliation were not protected under the booking exception to Miranda.  However, the state court reasonably evaluated the totality of circumstances to find petitioner waived his Miranda rights the day before.

Petitioner argues that this case is similar to United States v. Gillyard, 726 F.2d 1426 (1984), where the Ninth Circuit affirmed the district court's order finding that under the totality of circumstances the defendant did not make a voluntary, knowing and intelligent waiver of his Miranda rights.  However, Gillyard is distinguishable on its facts; in Gillyard, the defendant only volunteered to come in and take a polygraph.  726 F.2d at 1427.  Indeed, "the district court indicated that the major problem in the government's case was that the inspectors obtained the waiver of Gillyard's rights by telling him that he would only be subjected to a polygraph test." Id. at 1428.  No such inducement was present here.

In any event, even assuming, *arguendo*, that the state court erred in admitting petitioner's statements to Mays because petitioner was not re-advised of his Miranda rights prior to the Mays interview, the record demonstrates that the admission of petitioner's statements to Mays was harmless error, as explained next.

d. Harmless Error

Generally, habeas relief is appropriate only when a constitutional error was not harmless. Davis v. Ayala, 135 S. Ct. 2187, 2197 (2015).  "[A]n error is harmless on collateral review unless it results in 'actual prejudice.'"  Mays v. Clark, 807 F.3d 968, 980, quoting Brecht, 507 U.S. at 637; see also Fry v. Pliler, 551 U.S. 112, 120-22 (2007) (holding Brecht harmless error standard applies on collateral review by federal habeas court where state appellate court failed to recognize the error and did not review it for harmlessness); Arnold v. Runnels, 421 F.3d 859, 867-68 (9th Cir. 2005) (applying Brecht harmless error standard to statement taken in violation of Miranda). "Under this test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'"  Davis, 135 S. Ct. at 2197-98 (quoting O'Neal v. McAninch, 513 U.S. 432, 436 (1995)).

Because there is no reasoned state court opinion on the issue of harmless error in evaluating petitioner's <u>Miranda</u> claim, the undersigned reviews the claim *de novo*. <u>See</u> <u>Cone v. Bell</u>, 556 U.S. 449, 472 (2009); <u>Lewis v. Mayle</u>, 391 F.3d 989, 996 (9th Cir. 2004) ("De novo review, rather than AEDPA's deferential standard, is applicable to a claim that the state court did not reach on the merits.").

Here, petitioner has not shown that admission of his June 30, 2010 statements to Mays had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637. Petitioner argues that the record has no corroborating evidence, or independent information in the police files or the gang database which implicated petitioner as an active gang member, and was "notably absent from the predicate gang offenses which [Detective] Mercado detailed during trial." (ECF No. 27 at 16, citing RT 442, 471.)

However, in addition to his admissions to Mays, evidence was adduced at trial that petitioner associated with Paniagua, a documented Sureño gang member. (RT 457.) Barajas testified that it was petitioner who confronted Villanueva, pointing a gun at him. (RT 209.) Despite the often equivocal testimony of Barajas, evidence was adduced that the confrontation was a gang "hit-up," provoked by Villanueva wearing a red cross in known Sureño gang territory. (RT 487, 492-93.) Detective Mercado, who qualified as a gang expert, testified that such conduct could be characterized as a gang-related crime. (RT 447-48, 487; 493.)

Moreover, Detective Mercado opined that petitioner is a Sureño gang member. (RT 457-58.) Although this opinion was partially based on petitioner's statements to Mays, it was also based on petitioner's association with Paniagua, a documented Sureño gang member; petitioner's involvement in a gang-related incident, confronting two Norteño gang members on who they were and what they were doing in the area, and petitioner's involvement in the subsequent shooting. (RT 457-58.) During the interview with Tacazon, despite initially denying that he knew who Paniagua was, petitioner identified Paniagua as a VST gang member, and admitted that petitioner hung out with PBS gang members. (RT 136-37.) Petitioner also told Tacazon that petitioner hung out with the Sureños at the building where he lived. (RT 343.) When asked by
////

Tacazon whether petitioner hangs out with any PBS or VST gang members, petitioner conceded

that "they sometimes hang out here at the apartments." (RT 372.)

Finally, a roster of gang members that included petitioner was discovered at the San

Joaquin County Jail. (Clerk's Transcript 181; RT 47-62; 483-84; 501-09; 523.) Correctional

Officer Emmanuel Cruz testified that while conducting a random cell search at the San Joaquin

County Jail on February 10, 2011, Cruz discovered a yellow piece of paper rolled up tightly in

Saran wrap and a razor blade in Cell 57 in Intake 4. (RT 47-49; 57-58.) Cruz testified that, based

on his training or experience, he determined that the paper was a roster of all gang members who

had been housed in Intake 4. (RT 51-52.) Cruz confirmed that the names and cell locations listed

on the roster matched the individuals in Intake 4, and that petitioner was listed as Ismael

Martinez, cell 30, and was the same inmate as Ismael Aniceto (petitioner) who was housed in cell

30 at the time Cruz discovered the roster. (RT 52-53.) Mercado testified that he recognized some

of the names on the roster as Sureño gang members. (RT 483-84.) Gang Officer Featherstone

testified that active Sureño gang members and unaffiliated inmates are housed on Intake 4, but

that petitioner was not housed there as an unaffiliate. (RT 500-04.) Officer Featherstone testified

that petitioner was identified as having numerous aliases, including Ismael Rosales Martinez.

(RT 506.) Detective Mercado testified that the information contained in the roster confirmed his

opinion that petitioner was a Sureño gang member. (RT 455-56; 488.)

California law does not require the prosecution to present information from police files or

the gang database in order to establish the gang charge or enhancement. See, e.g., People v.

Garcia, 153 Cal. App. 4th 1499, 1509, 1511-12 (2007) (affirming gang enhancement even though

defendant had no gang-related tattoos, he was not seen wearing gang clothing or flashing gang

hand signs, and his name had not come up as an active member during recent interviews with

gang members). Indeed, "[e]xpert opinion that particular criminal conduct benefited a gang is not

only permissible but can be sufficient to support the Penal Code section 186.22, subdivision

(b)(1) gang enhancement." People v. Vang, 52 Cal. 4th 1038, 1048 (2011) (citation and internal

quotation marks omitted). The expert may properly "express an opinion, based on hypothetical

questions that track[ ] the evidence" whether the underlying crime was committed for a "gang

purpose." Id.  See also United States v. Larios, 640 F.2d 938, 940 (9th Cir. 1981) ("The testimony of one witness . . . is sufficient to uphold a conviction.") (citations omitted); Lopez v. Swarthout, 2011 WL 1832710, at *8 & 12 (C.D. Cal. 2011) (holding that overwhelming evidence of the petitioner's gang membership rendered harmless any error in admitting his statement that he was a gang member, which was given during a jailhouse interview without Miranda warnings); Vicente v. McDonald, 2011 WL 2971195, at *18-19 (E.D. Cal. 2011) (holding that, even if the admission of petitioner's statement that he was a gang member violated Miranda, the error was harmless because "substantial evidence exists from which the jury could have concluded petitioner was a gang member regardless of his admission to that effect[ ]").

Therefore, despite the fact that petitioner's admission of gang membership to Mays was powerful, there was other evidence of petitioner's gang involvement adduced at trial; thus, any error in admitting petitioner's statements to Mays was harmless.  See Brecht, 507 U.S. at 623. Such evidence was sufficient for the jury to conclude that the shooting was gang-related, and that every element of the gang charge and enhancement was true beyond a reasonable doubt. Accordingly, even assuming the trial court erred by admitting petitioner's June 30, 2010 statements to Mays, the error was harmless because it did not have a substantial effect or influence on the jury in determining the verdict in light of the other evidence adduced at trial.

### B.  Claim 2:  Insufficient Evidence

Petitioner alleges that the "record contains manifestly insufficient evidence to support the necessary conclusion that petitioner shared the intent to kill."  (ECF No. 15 at 37.)  Rather, petitioner contends that the evidence shows that petitioner and Paniagua shared no more than the intent to intimidate and assault Villanueva with a firearm.  Petitioner argues that there was no evidence that petitioner had a personal vendetta or any previous animosity toward Villanueva that would support a motive for murder.  Instead, petitioner contends that the evidence reflects that the confrontation was a "hit-up," or one gang intimidating members of another gang in retaliation for a perceived affront.  At the time of the shooting, the van drove about 30-35 miles per hour next to Villanueva and his brother, and the van maintained its speed throughout the incident, and after.
////

There was no evidence that petitioner stopped the van to provide Paniagua with a better shot, or that he sped up to flee the scene or evade witnesses. (ECF No. 15 at 38-39.)

Respondent argues that the state court's rejection of the sufficiency of the evidence claim was reasonable because a rational trier of fact could have found beyond a reasonable doubt that petitioner aided and abetted Paniagua: "petitioner knew Paniagua intended to shoot at the victims and facilitated the commission of the attempted murder by driving the van in a manner that allowed Paniagua to shoot at the victims." (ECF No. 23 at 26.)

    1. State Court Opinion

The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant's Conviction for Attempted Murder Is Properly Sustained Under a Simple Aiding and Abetting Theory
>
> At trial, the prosecutor argued defendant was guilty of attempted murder based on two theories: (1) defendant aided and abetted Paniagua in the attempted murder; and (2) defendant aided and abetted the earlier assault and a natural and probable consequence of that offense was the attempted murder. Defendant contends his conviction for attempted murder must be reversed because "the natural and probable consequence theory . . . is inapplicable because there is no evidence showing that Paniagua participated in the target offense of assault," and there is insufficient evidence to support a finding that the attempted murder was the natural and probable consequence of the earlier assault. As we shall explain, we need not address defendant's contentions related to the natural and probable consequences doctrine because the alternative theory advanced by the prosecution -- that defendant aided and abetted in the attempted murder itself -- is supported by substantial evidence, and there is no indication in the record that the jury based its verdict on the natural and probable consequences doctrine. (See People v. Guiton (1992) 4 Cal. 4th 1116, 1129 (Guiton).)
>
> In Guiton, our Supreme Court explained that where, as here, "the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (Guiton, supra, 4 Cal. 4th at p. 1129.)
>
> The evidence is overwhelming that defendant aided and abetted in the attempted murder. To be liable as an aider and abettor, a defendant "must act 'with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (People v. Houston (2012) 54 Cal. 4th 1186, 1224, quoting People v. Beeman (1984) 35 Cal. 3d 547, 560.) Here, defendant and Paniagua followed defendant and his brother in a van. Defendant, who was

driving, pulled alongside Villanueva and his brother, and Paniagua fired at them. The van maintained its speed as the shots were being fired. On this record, we have no trouble concluding that a jury reasonably could conclude that defendant knew that Paniagua intended to shoot at Villanueva and his brother, and that defendant facilitated the commission of the attempted murder by driving the van and positioning it so that Paniagua could shoot at the two men.

Moreover, having reviewed the record, we find no basis to conclude that the jury based its verdict on the natural and probable consequences doctrine. Although the prosecutor argued to the jury that the attempted murder was a natural and probable consequence of the earlier assault, he also argued defendant aided and abetted in the attempted murder itself. "[H]ow do you aid and abet? You make it possible. Could Samuel Paniagua have shot from a moving vehicle without a driver holding this particular car steady? No . . . . That's why, in drive-by shootings, the drivers and the shooters are equally responsible; you cannot have one without the other." Contrary to defendant's suggestion, the prosecutor distinguished between the two alternative theories and did not spend significantly more time on the natural and probable consequences doctrine.

Accordingly, defendant's conviction for attempted murder is properly affirmed under a simple aiding and abetting theory of liability.

People v. Aniceto, No. C069293, 2013 WL 1174562, at *5-6 (Cal. Ct. App. Mar. 22, 2013)

(LD at 9-11.)

### 2. Standards

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011).

////

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (per curiam) (citation omitted). A federal court on habeas review faced with a factual record "that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant relief, the federal habeas court must find that the decision of the state court rejecting an insufficiency of the evidence claim reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13. Thus, when a federal habeas court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011). The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

### 3. Discussion

After reviewing the state court record in the light most favorable to the jury's verdict, this court concludes that there was sufficient evidence introduced at petitioner's trial to support his conviction for attempted murder based on an aiding and abetting theory. There was evidence from which the jury could have found that petitioner shared Paniagua's intent based on petitioner pointing a gun at Villanueva during the initial confrontation, and then by petitioner's assistance in

following Villanueva and his brother in a vehicle, driving the van in front of witness Nocks rather than waiting his turn, causing her to brake. (RT 253-54.) Petitioner then drove the van in a steady fashion, pulled up beside the victims, allowing Paniagua to shoot at Villanueva and his brother. (RT 254.) The court of appeal, in evaluating the evidence in the light most favorable to the prosecution, found that a rational juror could conclude that petitioner knew Paniagua intended to shoot at Villanueva and his brother, and that petitioner facilitated the commission of attempted murder by driving the vehicle, and positioning it so that Paniagua could shoot at the two men. This is true regardless of the fact that there might have been another way of viewing the evidence that would support petitioner's version of the events. Petitioner argues that the evidence demonstrates that petitioner intended to intimidate and assault Villanueva, not murder him.

But the question here is not whether there was evidence from which the jury could have found for the petitioner on these issues. Rather, in order to obtain federal habeas relief on this claim, petitioner must demonstrate that the trial courts' denial of relief with respect to his insufficiency of the evidence arguments was an objectively unreasonable application of the decisions in Jackson and Winship to the facts of this case. Petitioner has failed to make this showing, or to overcome the deference due to the state court's findings of fact and its analysis of this claim. Accordingly, petitioner is not entitled to federal habeas relief on his claim of insufficient evidence.

VI. Certificate of Appealability

Before petitioner can appeal this decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue. Fed. R. App. P. 22(b).

For the reasons set forth above, the undersigned finds that petitioner has not made a showing of a substantial showing of the denial of a constitutional right.

////

28

VII. <u>Conclusion</u>

  Accordingly, IT IS HEREBY ORDERED that:

  1. Petitioner's application for a writ of habeas corpus is denied; and

  2. The court declines to issue the certificate of appealability referenced in 28 U.S.C. § 2253.

Dated: May 18, 2017

             KENDALL J. NEWMAN
             UNITED STATES MAGISTRATE JUDGE

/anic1819.157